## Lizzie Rumbold v. Supreme Council Royal League.

1.  EVIDENCE—*Overcoming Presumption Against Suicide.*—Evidence
that carbolic acid was taken, in a dose sufficient to destroy life, that it
was carefully placed in the back of the mouth, that the deceased had
been absent from home five days apparently wandering aimlessly about,
that his linen had not been changed and was soiled, that he was found
at midnight in a dying condition in a retired place far from his home,
in a part of the city where there was apparently no occasion for him to
be, and that he apparently made no outcry, though he must have known
that he had taken poison, all tend to show intentional self-destruction,
and suffice to overcome the presumption of law against suicide.

2.  GARNISHMENT—*Duty of Party Garnisheed, to Creditor.*—The law
requires a party, when garnisheed, to claim for his creditor the benefit
of an exemption allowed by law.

Assumpsit, upon a benefit certificate.   Error to the Superior Court
of Cook County; the Hon. AXEL CHYTRAUS, Judge presiding.   Heard
in the Branch Appellate Court at the October term, 1901.   Affirmed.
Opinion filed October 24, 1902.

UTT BROTHERS, attorneys for plaintiff in error.

MILLARD R. POWERS, attorney for defendant in error.

MR. PRESIDING JUSTICE FREEMAN delivered the opinion of the court.

This was a suit upon a benefit certificate issued to Harry H. Rumbold, husband of the plaintiff in error, which entitled the latter to $4,000 upon the death of her said husband from any cause except suicide. Said certificate contained a provision: "If any member shall die by his own act or hand, sane or insane, his beneficiary or beneficiaries shall receive only one-half of the face value of his benefit certificate." The question upon the trial was whether plaintiff's husband committed suicide.

The deceased lived on Throop street in the West Division of Chicago, but he was found a little after midnight, July 7, 1897, by the police of the Hyde Park station, about a hundred feet from the shore of the lake, near Fifty-third street. He was lying on his back near a tree, apparently unconscious and breathing heavily. He was well dressed, had a gold watch and some small change on his person, and his clothing was not disarranged. He lived only a few minutes after being taken to the police station. An inquest and a post mortem examination were had. The coroner's physician who made the examination testified on the trial of this case that in his opinion, as a result of the examination, death was caused by carbolic acid, about two table-spoonfuls, taken internally, and that the condition of the organs of the body were characteristic of carbolic acid poisoning. He states that if the acid is placed in the back of the mouth it causes the back part of the tongue to become shriveled and whitened, a condition which he found existing in this case; that he found the gullet white and red, corrugated and thickened and smelling of carbolic acid, and that the heart contained dark fluid blood also smelling of the same. He found no indication of any disease that would produce death. Aside from the congestion ascribed to the acid, the organs of the body were apparently healthy. Evi-

dence was introduced tending to show that a sufficient quantity of this acid to produce death could not be taken without knowledge on the part of the victim that he had taken something unusual, but its effect would not be so sudden as to deprive him of the power of moving about and making an outcry sufficient to attract attention. The place where the deceased was found was near East End avenue, where an outcry, it is said, would have been likely to attract attention. On the other hand it appears that no quantitive test or chemical examination of the contents of the stomach was made, and a search where the dying man was found, made, however, with a lantern, that same night, failed to discover any bottle or similar receptacle from which the acid could have been taken. The officers who carried the man to the ambulance noticed nothing unusual about the mouth, and did not perceive the smell of carbolic acid. There is evidence to the effect that deceased had some bowel or stomach trouble at or just before the time when he last left his home, July 2d, five days before his death, and testimony was introduced in behalf of the plaintiff tending to show that certain medicines containing carbolic acid used for such disorders are sold by druggists without prescriptions; the inference being drawn that death in this case might have accidentally resulted from the use of some such remedy. There is no evidence tending to show that any such medicine was used. The deceased was a sober and industrious man, with a happy disposition, attached to his wife and son, and his domestic relations were happy.

In support of the contention that her husband committed suicide, and plaintiff is not therefore entitled to recover the full amount of the benefit certificate, the defendant introduced evidence intended to show that he was at the time involved in financial difficulty. It was shown that he owed a few persons small sums of money, scarcely large enough to cause anxiety, however, and that he held two or three pawn tickets for gold watches, it is said, pledged at a pawnshop. He had lost a place in the employ of the city about

two years before, and was intending to take the civil service examination in the hope of again obtaining city employment. But the plaintiff testifies that he was earning at the time of his death from fifteen to twenty-five dollars a week, and, if so, no motive for suicide apparently existed for want of sufficient income.

There was, however, one transaction upon which defendant especially relies as showing a motive for self-destruction. One Mrs. Shannon, the widow of a garbage contractor, testifies that in April preceding his death she had loaned the deceased $500 to make a deposit with the city with a bid for a garbage contract, he promising that if he obtained it he would put her teams to work. Later she became anxious about the money, and June 23d, Rumbold wrote her that it was safe, that he was sure of one ward, and would like her to wait until the 28th. Upon that day he wrote again that he would know by Wednesday following, and that if he did not get a ward he would return her money Thursday noon. Mrs. Shannon testifies that the money was not returned to her, and she sent her brother-in-law, one McCauliffe, to see Rumbold in her behalf. McCauliffe states that he had a conversation with Rumbold; told him he knew he had not bid on these contracts, demanded an explanation and threatened to commence proceedings to collect the money unless it was returned. He says that Rumbold told him that he had the money, and intended to pay it back, and that "it was some other fellow's fault that threw him down," mentioning the name. This interview is said to have occurred the latter part of June or the first or second of July. The second day of July Rumbold left home in the morning, telling his wife he was going to the city hall to see about taking the civil-service examination, and about getting a garbage contract for Mrs. Shannon. He was not seen again by any of his family or friends, so far as appears, until after his death, five days after, July 7th.

Plaintiff sought to show that Mrs. Shannon did obtain a garbage contract, and that it was taken in McCauliffe's

name for her. The trial court, however, sustained objections to this line of examination, and refused plaintiff's offer to show that a deposit of $500 and a bid were made by McCauliffe in his own name, June 28th; that afterward, July 9th, a bond was given, the $500 deposit was withdrawn and the contract let to McCauliffe for Mrs. Shannon for the ward Rumbold was trying to obtain. In reply to a question by the court, however, plaintiff's attorneys stated that they could not show directly that McCauliffe got this money from Rumbold, but insisted that all the facts should go to the jury. The objection was sustained to this offer, and plaintiff urges that it was error to exclude the testimony offered. We think the evidence might very properly have been admitted. Plaintiff in her testimony states that she overheard part of a conversation between Rumbold and McCauliffe at her house a few days before her husband's death, in which the latter said he would get a contract in his own name, and Rumbold told him to do so. The only purpose of the introduction of the transaction with Mrs. Shannon and McCauliffe was to show a motive for Rumbold's suicide. He could not speak for himself. If the money was in fact applied for Mrs. Shannon's benefit, the alleged motive disappears.

But if the entire evidence of Mrs. Shannon and McCauliffe had been stricken out, we are of opinion that the undisputed facts and circumstances sufficiently justify the verdict of the jury. The evidence that carbolic acid was taken, in a dose sufficient to destroy life, that it was carefully placed in the back part of the mouth, that the deceased had been absent from home five days apparently wandering aimlessly about, that his linen had not been changed and was soiled, that he was found at midnight in a dying condition in a retired place far from his home, in a part of the city where there was apparently no occasion for him to be, and that he apparently made no outcry, though he must have known he had taken poison, all tend to show intentional self-destruction, and suffice in our opinion to overcome the presumption of law against suicide.

Cross-errors were assigned by the defendant.   It is urged that the latter is entitled to a credit of $130 paid in satisfaction of a judgment of garnishment obtained before a justice of the peace, for the use of one Landon.   By the provisions of Sec. 254, Chap. 73, R. S. of Illinois, the money due plaintiff in error on the benefit certificate was not liable to garnishee or other process, legal or equitable, to pay any debt or liability of a policy or certificate holder. The defendant did not make this defense to the proceeding, and now contends that it was not bound to do so, because it had drawn its check for the amount now found to be due plaintiff and tendered the same to her, and claims thereafter to have held the money as trustee for the plaintiff, and as such to have been amenable to garnishee process.

Plaintiff in error refused to accept a check for $2,000 on the ground that her husband had not committed suicide, and that she was entitled to the full amount of the certificate, $4,000.   But there is no evidence that the fund had been set aside by defendant, or its character in any respect changed.   The law requires a party, when garnisheed, to claim for his creditor the benefit of an exemption allowed by law.   C. & A. R. R. Co. v. Ragland, 84 Ill. 375; Welker v. Hinze, 16 Ill. App. 326.   The defendant's liability was the same in all respects after as before it tendered its check to the plaintiff.   In Martin v. Martin, 187 Ill. 200, the money had been collected by an agent of the beneficiary in whose hands it had been garnished.   That case is not in point under the facts before us.

The judgment of the Superior Court must be affirmed.